IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
LUFKIN DIVISION

| | | |
|---|---|---|
| FALLON REAGANS AS NEXT FRIEND FOR B.E.J., A CHILD, | § § § § | |
| *Plaintiff*, | § § | |
| v. | § § | CIVIL ACTION NO. 9:21-CV-00267 JUDGE MICHAEL J. TRUNCALE |
| GRAPELAND INDEPENDENT SCHOOL DISTRICT, | § § § § | |
| *Defendant*. | § | |

### ORDER AND OPINION GRANTING DEFENDANT GRAPELAND INDEPENDENT SCHOOL DISTRICT'S MOTION FOR SUMMARY JUDGMENT

This tragic case involves a child who was sexually abused by his teacher. The Court is called to determine not whether the perpetrator is responsible for her horrific actions, but instead whether the school district that employed her is. Because the evidence does not support a finding that the school district had actual knowledge of the abuse, and governmental immunity shields the school district from the plaintiff's negligence claim, the Court must grant Defendant Grapeland Independent School District ("GISD")'s Motion for Summary Judgment. [Dkt. 63].

#### I.   BACKGROUND

B.E.J. began attending school at Grapeland Elementary School in the fourth grade. This is when he first met Melissa Singer, who taught his fourth-grade math class. [Dkt. 65-1 at 6]. During the 2017–2018 school year, B.E.J. was a fifth grader at Grapeland Elementary, and Ms. Singer taught his homeroom and math classes. *Id.* That same year, B.E.J. also became best friends with Ms. Singer's son, C.S., who was in his physical education class. *Id.* at 7. After they became friends, B.E.J. started going to Ms. Singer and C.S.'s house. *Id.* Ms. Singer always drove B.E.J. to their house—sometimes driving him from school, and other times picking him up from his house. *Id.* at

8. She also started giving B.E.J. special treatment at school. She let him: sit on her "rolly chair" on his phone while other students had to read, select the crafts that the class did during the 2017 Christmas season, work on his crafts while the class did other work, and grade papers. *Id.* at 10. He also ate lunch in her classroom most days. *Id.* at 14. Usually, he was the only student in her classroom during lunch. *Id.* But on occasion, C.S., or students who had to make up work, also ate in there. *Id.* This special treatment all occurred during his fifth-grade school year.

Ms. Singer began sexually abusing B.E.J. in the summer of 2018—the summer between his fifth- and sixth-grade school years. He testified that she first sexually abused him that summer when he joined the Singer family on a vacation to California. *Id.* at 15–16. One day during the summer of 2018, Ms. Singer asked B.E.J. to help her set up her classroom. *Id.* at 14. He was already at the Singer house, having slept over the night before, and just the two of them went to the school. *Id.* at 14–15. At some point, Ms. Singer turned off the classroom lights, and put her hands and mouth on his penis. *Id.* at 14. When asked if he saw anyone else at the school that day, B.E.J. testified that Amy Howard—another Grapeland Elementary teacher—was there but that he had no clue whether she witnessed the abuse. *Id.* at 15. Ms. Singer also sexually abused B.E.J. at her house during the first weekend of his sixth-grade year, after she had picked him and C.S. up from the junior high school. *Id.* at 16.

B.E.J.'s mother, Plaintiff Fallon Reagans first saw Ms. Singer at the Valentine's Day school dance in 2017—B.E.J.'s fourth-grade year. During the dance, Ms. Singer grabbed B.E.J. by his hand and pulled him to the dance floor to dance. B.E.J. was a new student at the time, and his mother testified that she perceived Ms. Singer's actions as "just trying to get him to . . . open up or . . . feel comfortable . . . versus just standing there, watching the rest of the kids." [Dkt. 65-2 at 10]. Ms. Reagans became more acquainted with Ms. Singer during B.E.J.'s fifth-grade year,

after he became "best friends" with C.S. *Id.* During this time, Ms. Reagans and B.E.J. were relatively new to town. Ms. Reagans was a single mom and did not know many people, but she felt comfortable allowing B.E.J. to spend time at the Singers' house with C.S. because Ms. Singer taught at the school, so Ms. Reagans trusted her. *Id.* at 11, 13. Ms. Singer also helped Ms. Reagans with her other children on at least one occasion when Ms. Reagans had to work late. *Id.* at 13. Ms. Reagans never thought anything strange of Ms. Singer's offers to help, and she was grateful for the assistance. *Id.* She described Ms. Singer as "the favorite teacher"—not just B.E.J.'s favorite teacher but to all the kids. *Id.* at 14. B.E.J. did divulge to his mom that Grapeland Elementary principal, Cassie Satterwhite, told him that Ms. Singer "shows him favoritism," and that other kids made comments about Ms. Singer letting him be the line leader and eat lunch in her room. *Id.* at 15. But Ms. Reagans did not think B.E.J. seemed bothered by the comments, nor did they cause her concern. *Id.*

Multiple employees at the school noticed the favoritism too, but none suspected that Ms. Singer was sexually abusing him. Kristi Streetman—assistant to Principal Satterwhite during the relevant period—testified that she saw Ms. Singer set up a lunch for B.E.J. in the cafeteria on Valentine's Day and that she considered it "weird." [Dkt. 65-4 at 2]. Specifically, she testified that Ms. Singer set out a tablecloth, brought flowers for him to give her, and said she "was trying to make him grow up to be a respectable young man." *Id.* She also once observed B.E.J. and Ms. Singer together on a field trip standing side by side, but she testified that there were other students with them, and that Ms. Singer did not seem to be more with B.E.J. than the other students. *Id.* Ms. Streetman further testified that while she apprised Principal Satterwhite of both instances, *id.* at 3, she never suspected or reported anything sexual in nature until after Ms. Singer's arrest. *Id.* at 6–7. Ms. Howard—the teacher that B.E.J. said was present at Grapeland Elementary when Ms.

Singer sexually abused him in the summer of 2018—testified that while she noticed, and discussed with fellow teacher Amanda Kincade, that Ms. Singer showed favoritism to B.E.J., she never suspected a sexual relationship. [Dkt. 65-3 at 3, 5, 8]. Ms. Howard further testified that she never discussed Ms. Singer and B.E.J.'s relationship with Principal Satterwhite, and never otherwise reported it. *Id.* at 3–4, 8. Likewise, Ms. Kincade testified that she noticed Ms. Singer showing favoritism to B.E.J.—primarily that she often let B.E.J. eat lunch in her room and transported him to and from school—but that it did not make her "uneasy" and she never witnessed any conduct that caused her to believe that Ms. Singer was sexually assaulting B.E.J. [Dkt. 65-5 at 3, 7]. She recalled one occasion when she saw B.E.J. and Ms. Singer together at Walmart, *id.* at 10, and a separate occasion where she walked into Ms. Singer's classroom and saw B.E.J. and Ms. Singer sitting together on a chair with other students beside her. *Id.* Ms. Kincade testified that she informally, through casual conversations, told Principal Satterwhite about seeing Ms. Singer and B.E.J. sitting together on a chair and that he often came and went from school with her. *Id.* at 4. But she did not make any report which she would expect to have prompted a sexual harassment investigation. *Id.* at 7. Finally, Principal Satterwhite testified that she received reports from Ms. Streetman and Ms. Kincade, and that in response she "talk[ed] with them" and "would go into [Ms. Singer's] classroom more to see if [she] could see things for [herself]." [Dkt. 65-6 at 4]. She felt that Ms. Singer showed B.E.J. favoritism because she was friends with his mom, and he was friends with C.S. *Id.* The reports did not lead her to open a sexual harassment investigation, but she did pass them on to Don Jackson, the GISD superintendent at the time. *Id.*

During the fall of his sixth-grade year, B.E.J. reported Ms. Singer's abuse to his mother and the sheriff's office. Ms. Singer was subsequently arrested. Here, Ms. Reagans, as next friend for B.E.J., alleges: (1) that GISD intentionally violated Title IX by acting deliberately indifferent

4

to Ms. Howard's, Ms. Kincade's, and Ms. Streetman's reports of Ms. Singer's sexual abuse and harassment, and that from these reports, Principal Satterwhite—a GISD employee with supervisory power over Ms. Singer—had actual knowledge of Ms. Singer's grooming; and (2) that GISD is liable for negligence for the abuse B.E.J. suffered. [Dkt. 29 at 9–10]. GISD now seeks summary judgment on both causes of action. [Dkt. 63].

## II. LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, "[s]ummary judgment is proper when the pleadings and evidence demonstrate that no genuine issue of material fact exists, and the movant is entitled to judgment as a matter of law." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (internal citations omitted); Fed. R. Civ. P. 56(c). An issue is material if its resolution could affect the outcome of the action. *DIRECTV*, 420 F.3d at 536. A dispute as to a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* All reasonable inferences must be drawn in favor of the nonmoving party. *Smith v. Amedisys, Inc.*, 298 F.3d 434, 440 (5th Cir. 2002). There is no genuine issue of material fact if, when the evidence is viewed in the light most favorable to the nonmoving party, no reasonable trier of fact could find for the nonmoving party. *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1263–64 (5th Cir. 1991) (citations omitted).

Where the dispositive issue is one which the nonmoving party will bear the burden of persuasion at trial, the moving party may satisfy its burden of production by either (1) submitting affirmative evidence that negates an essential element of the nonmovant's claim, or (2) demonstrating that there is no evidence in the record to establish an essential element of the nonmovant's claim. *St. Amant v. Benoit*, 806 F.2d 1294, 1297 (5th Cir. 1987) (internal citations omitted).

If, under the first option, the nonmoving party cannot point to evidence sufficient to dispute the movant's contention that there are no disputed facts, the moving party is entitled to summary judgment as a matter of law. *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 288–89 (1980); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249–50 (1986). Under the second option, the nonmoving party may defeat the motion by pointing to "supporting evidence already in the record that was overlooked or ignored by the moving party." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332–33 (1986) (Brennan, J., dissenting). "Conclusory allegations unsupported by concrete and particular facts will not prevent an award of summary judgment." *Duffy v. Leading Edge Prods.*, 44 F.3d 308, 312 (5th Cir. 1995).

If the nonmoving party can meet its burden under either of these scenarios, the burden shifts back to the movant to demonstrate the nonmovant's inadequacies. *Id.* If the movant meets this burden, "the burden of production shifts [back] to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers, (2) produce additional evidence showing the existence of a genuine issue for trial as provided in Rule 56(e), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f)." *Celotex*, 477 U.S. at 333 n.3. "Summary judgment should be granted if the nonmoving party fails to respond in one or more of these ways, or if, after the nonmoving party responds, the court determines that the moving party has met its ultimate burden of persuading the court that there is no genuine issue of material fact for trial." *Parekh v. Argonautica Shipping Invests. B.V.*, No. CV 16-13731, 2018 WL 295498, at *3 (E.D. La. Jan. 4, 2018) (quoting *Celotex*, 477 U.S. at 333 n.3).

## III.   DISCUSSION

### A. Title IX Claim

In pertinent part, Title IX provides that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). The prohibition of discrimination on the basis of sex includes sexual harassment and abuse. *See Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60, 75 (1992).

Title IX is a product of Congress's spending power, and it operates like a contract between the Government and the recipients of funds: the Government offers funding in exchange for the recipient's promise not to discriminate. *Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 286–87 (1998); *see* U.S. Const. art. I, § 8, cl. 1 ("The Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States . . . ."). While the statute's text does not provide an express private right of action, individuals may seek enforcement of Title IX, including monetary damages, through an implied private right of action. *Gebser*, 524 U.S. at 280–81 (citing *Cannon v. Univ. of Chi.*, 441 U.S. 677 (1979); *Franklin v. Gwinnett Cnty. Pub. Schs.*, 503 U.S. 60 (1992)). Therefore, "[a] school district receiving federal funds may be held liable under Title IX via a private action for damages when its employees sexually abuse students." *M.E. v. Alvin Indep. Sch. Dist.*, 840 F. App'x 773, 775 (5th Cir. 2020) (per curiam) (citing *Gebser*, 524 U.S. at 281). But given Title IX's contractual nature, and that Congress did not speak to the bounds of private recovery, a plaintiff may recover damages against a school district only if the school district had actual knowledge of the sexual discrimination. *Gebser*, 524 U.S. at 285. Constructive notice does not suffice, and agency theories of liability do not apply. *Id.* "Title IX precedent creates a 'high bar' to hold school

7

districts liable for the unlawful acts of school employees." *M.E.*, 840 F. App'x at 776 (quoting *Howell v. Austin Indep. Sch. Dist.*, 323 F. App'x 294, 295 (5th Cir. 2009)).

A school district that receives federal funding cannot be liable in damages for a teacher's sexual harassment of a student unless: (1) an official with authority to address the alleged discrimination and institute corrective measures had *actual* knowledge of the discrimination; and (2) the official responded to the knowledge with deliberate indifference. *Doe v. Edgewood Indep. Sch. Dist.*, 964 F.3d 351, 358–59 (5th Cir. 2020) (citing *Gebser*, 524 U.S. at 290). The first prong is fulfilled if the official with authority "actually knew that there was a substantial risk that sexual abuse would occur." *See Rosa H. v. San Elizario Indep. Sch. Dist.*, 106 F.3d 648, 652–53 (5th Cir. 2020).

*M.E. v. Alvin Independent School District* is factually similar to the present case. It involved a school resource officer, Tennard, who groomed a student for sexual abuse during her sixth-grade year, and then raped or otherwise sexually abused her over twenty times beginning during her seventh-grade year. *M.E.*, 840 F. App'x at 794. Tennard's relationship with the student began when he saw her crying at school and invited her into his office to talk. *Id.* He became a confidant to her, and she frequently visited his office to discuss personal family matters. *Id.* During this time, Tennard made sexual innuendos to the student, who did not understand what he meant. *Id.* A couple of months after Tennard began sexually abusing the student, her mother learned that she had missed class to spend time in his office. *Id.* Her mother met with the assistant principal and the student's English teacher, and expressed concern that her daughter was discussing personal family matters with Tennard and the English teacher. *Id.* She requested that her daughter be directed to her counselor instead, and that her relationship with Tennard and the teacher be kept on a professional level only. *Id.* Following the meeting, the assistant principal informed school

administrators and Tennard that the student's mother did not want her having any interaction with Tennard. *Id.* He nonetheless continued to meet with her, and the abuse continued. *Id.* About a year after Tennard first raped the student, the assistant principal discovered that the student had again skipped class to visit Tennard. *Id.* She reported the incident to the principal and reminded Tennard that the student's mother did not want her spending time with him. *Id.* Shortly thereafter, the student's mother found sexually explicit messages on the student's phone, and uncovered the abuse. *Id.* The student's parents subsequently filed a Title IX claim against the school district. *Id.* at 775. Finding that the school district did not have actual knowledge of the sexual abuse, the Fifth Circuit affirmed the district court's grant of summary judgment in favor of the school district. *Id.* at 776. The court reasoned:

> School administrators were aware of a close—likely inappropriately close—relationship between [the student] and Tennard. But before Tennard's arrest, there were no allegations of any sexual harassment. Although [the student's mother] expressed discomfort with the bond between her daughter and Tennard in her meeting with [the assistant principal], there was no mention that anything of a sexual nature might be occurring. Rather, the meeting concerned [the student's] struggles at school and her penchant for confiding personal matters in a school police officer and teacher instead of her school counselor or therapist. All the meeting attendees other than Tennard—[the student's mother, English teacher, and assistant principal]—testified that they did not suspect sexual abuse. Although the meeting put the district on notice that Tennard had become a trusted confidant for [the student] it did not provide notice of a substantial risk that sexual abuse was occurring.

*Id.* The plaintiffs argued that the assistant principal's discovery that the student again skipped class to visit Tennard should have raised the administration's suspicion. *Id.* But the court rejected this argument because the evidence "fell short of putting them on notice of 'a substantial risk' for sexual abuse." *Id.* (quoting *Rosa H.*, 106 F.3d at 652–53). The court also recognized that "[t]here may have been, as plaintiffs contend, 'red flags' that should have alerted the district of a substantial risk that Tennard was sexually assaulting [the student]. But the law requires that the district

9

actually knew of the risk, not just that it should have known." *Id.* (citing *Rosa H.*, 106 F.3d at 652–53, 656).

Here, Plaintiff argues that Principal Satterwhite and Superintendent Jackson were appropriate GISD officials who had actual knowledge that Ms. Singer was sexual grooming B.E.J. [Dkt. 73 at 7]. "*Any* contact between an adult and a child could be grooming behavior, but that does not mean that all contact is sexual harassment under Title IX." *S.P. v. Ne. Indep. Sch. Dist.*, No. SA-21-CV-0388-JKP-RBF, 2021 WL 3272210, at *6 (W.D. Tex. July 30, 2021) (quoting *Doe v. Madison Metro. Sch. Dist.*, No. 15-CV-570-BBC, 2017 WL 527892, at *5 (W.D. Wis. Feb. 9, 2017)). Therefore, the Court must look to whether there is evidence that Principal Satterwhite or Superintendent Jackson actually knew of the sexual abuse or of a substantial risk of sexual abuse.

Prior to Ms. Singer's arrest, there were no allegations of sexual harassment. While Ms. Streetman, Ms. Howard, and Ms. Kincade all noticed Ms. Singer and B.E.J.'s close relationship, not one suspected, let alone reported, sexual abuse. True, Principal Satterwhite and Superintendent Jackson had notice that B.E.J. and Ms. Singer had a close relationship, and that Ms. Singer showed B.E.J. favoritism. But no evidence suggests that they had actual notice that Ms. Singer was sexually abusing B.E.J or that there was a substantial risk that she would sexually abuse him. B.E.J. and Ms. Singer's son were best friends, so Ms. Reagans allowed B.E.J. to spend a significant amount of time at their house. Therefore, it is understandable that B.E.J.'s coming and going with Ms. Singer did not raise red flags, let alone actually notify GISD of abuse or the substantial risk of abuse, as the law requires. *See M.E.*, 840 F. App'x at 776 ("There may have been, as plaintiffs contend, 'red flags' that should have alerted the district of a substantial risk that Tennard was sexually assaulting [the student]. But the law requires that the district actually knew of the risk, not just that it should have known.").

10

The Court agrees that the Valentine's Day lunch that Ms. Singer set up for B.E.J. is, at a minimum, weird. As is Ms. Singer and B.E.J. sharing a chair. But this Court must follow the Supreme Court's and Fifth Circuit's precedents, which set a high bar for plaintiffs to recover monetary damages under Title IX. *See, e.g.*, *Gebser*, 524 U.S. at 277, 291 (holding that parents' complaints to the principal that a teacher made sexually suggestive comments during class were "plainly insufficient to alert the principal to the possibility that [the teacher] was involved in a sexual relationship with a student"). The evidence here does not support a finding that an official with authority to address the alleged discrimination and institute corrective measures had actual knowledge that Ms. Singer was sexually abusing B.E.J, or that there was a substantial risk that she would sexually abuse him. *See Edgewood Indep. Sch. Dist.*, 964 F.3d at 358–59. Because this is a necessary element of Plaintiff's Title IX claim, GISD's Motion for Summary Judgment on this claim must be granted.

**B.  Texas Negligence Claim**

Plaintiff also brings a negligence claim against GISD. [Dkt. 29 at 10]. Plaintiff alleges that GISD owed B.E.J. a duty of reasonable care, and breached that duty—proximately causing B.E.J.'s injuries—in multiple ways, including: (1) failing to properly hire, train, and retain employees, staff, and faculty as to "proper methods to deal with reports of sexual abuse and investigate same"; (2) failing to properly and timely report incidents, suspicions, or claims of sexual assault; (3) failing to investigate and/or monitor persons accused or suspected of sexual assault; and (4) failing to train employees to recognize signs of potential sexual assault. *Id.* at 10–11. GISD contends that

governmental immunity entitles it to summary judgment on Plaintiff's negligence claim. [Dkt. 63 at 20].[1] The Court agrees.

Plaintiff concedes that "[a]s an agency of the State, GISD is immune from liability for the negligence of its agents or employees except to the extent that such immunity is waived by the Texas Tort Claims Act (TTCA)." [Dkt. 29 at 11] (citing Tex. Civ. Prac. & Rem. Code Ann. § 101.021). Plaintiff's position, however, is that the TTCA waives GISD's immunity. *Id.* The TTCA section titled "Governmental Liability" provides:

> A governmental unit in the state is liable for:
>
> (1) property damage, personal injury, and death proximately caused by the wrongful act or omission or the negligence of an employee acting within his scope of employment if:
>
>  (A) the property damage, personal injury, or death *arises from the operation or use of a motor-driven vehicle* or motor-driven equipment; and
>
>  (B) the employee would be personally liable to the claimant according to Texas law; and
>
> (2) personal injury and death so caused by a condition or use of tangible personal or real property if the governmental unit would, were it a private person, be liable to the claimant according to Texas law.

Tex. Civ. Prac. & Rem. Code Ann. § 101.021 (emphasis added). Because Ms. Singer "used her vehicle to drive B.E.J. home from a GISD school campus and sexually assault him at her home" Plaintiff contends that "B.E.J.'s injuries arose, at least in part, from the operation or use of a motor vehicle." [Dkt. 29 at 12]. Plaintiff's argument fails, however, because "[i]n order to show waiver under section 121.021(1), the use of the vehicle must actually cause the complainant's injury." *City of Hous. v. McCullough*, No. 01-02-00081-CV, 2003 WL 141251, at *3 (Tex. App.—Houston

---

[1] GISD first raised the issue of governmental immunity in its Motion to Dismiss Plaintiff's Second Amended Complaint, where it sought to dismiss Plaintiff's negligence claim for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1). [Dkt. 30 at 7]. GISD subsequently filed the present Motion for Summary Judgment before the Court had the opportunity to resolve the Motion to Dismiss.

[1st Dist.] Jan. 9, 2003, pet. denied). A state employee's mere use of a vehicle to facilitate the commission of an intentional tort does not waive immunity. *Id.*

In *McCullough*, a Houston police officer stopped the plaintiff for an alleged traffic violation, arrested her, placed her in his patrol car, and drove her to a deserted parking lot where he sexually assaulted her at gunpoint. *Id.* at 1. She sued the City of Houston and the Houston Police Department for negligence under the TTCA, and asserted that Section 101.021 waived the City's immunity because "the City was negligent in its operation or use of a motor-driven vehicle." *Id.* at 3. The Houston First Court of Appeals rejected this argument:

> "Use" means "to put or bring into action or service; to employ for or apply to a given purpose." . . . In order to show waiver under section 121.021(1), the use of the vehicle must actually cause the complainant's injury. In this case, only [the police officer] used the police car to facilitate his commission of an intentional tort. There were no other employees "using" the police car. . . . Because [the plaintiff] did not provide any factual basis to show that the City negligently used a motor vehicle that caused her injury, her claims to not fall within the section 121.021(1) waiver provision.

*Id.*

Here, Plaintiff contends that that B.E.J.'s injuries arose, at least in part, from the operation or use of a motor-driven vehicle because Ms. Singer "used her vehicle to drive B.E.J. home from a GISD school campus and sexually assaulted him at her home." [Dkt. 29 at 12]. Plaintiff does not allege that Ms. Singer's negligent use of a vehicle caused B.E.J.'s injuries—just that Ms. Singer used a vehicle to facilitate her commission of an intentional tort. *See McCullough*, 2003 WL 141251, at *3. Because the TTCA does not waive governmental immunity here, GISD's Motion for Summary Judgment on Plaintiff's negligence claim is granted.

## IV.  CONCLUSION

By no means does the Court minimize the horrific abuse that Melissa Singer inflicted upon B.E.J. But the Court must apply the facts to the law. And the law does not support holding GISD responsible for Ms. Singer's reprehensible and disgusting actions.

It is therefore **ORDERED** that Defendant Grapeland Independent School District's Motion for Summary Judgment [Dkt. 63] is **GRANTED**. A final judgment will be entered in this case in accordance with this order.

**SIGNED this 6th day of February, 2023.**

Michael J. Truncale
United States District Judge